## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Eigen, Inc.,[1] | ) | Case No. 10-11061 (___) |
| | ) | |
| _____ Debtor. _____ | ) | |

## DECLARATION OF RICHARD EDICK IN SUPPORT OF
## FIRST DAY MOTIONS AND APPLICATIONS

I, Richard Edick[2], Chief Restructuring Officer of Eigen, Inc. ("**Eigen**" or "**Debtor**"), as a debtor and debtor in possession in the above-captioned case, hereby declare under penalty of perjury:

1.    I am over 18 years of age and, if called as a witness, could and would testify as to the matters set forth below based upon my personal knowledge.

2.    I am familiar with the business operations, assets and liabilities of the Debtor. It is my understanding that on March 30, 2010 (the "**Petition Date**"), the Debtor sought relief as a debtor and debtor in possession under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). I submit this Declaration (the "**Edick Declaration**") to assist the Court and the other parties-in-interest in understanding the circumstances that compelled the commencement of this chapter 11 case (the "**Case**") and in support of the first day motions and applications filed in this Case (the "**First Day Motions**"). Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, information provided to me by certain of the Debtor's employees, my review of relevant documents, or my opinion based

---

[1] The Debtor in this chapter 11 case is Eigen, Inc. The last four digits of the Debtor's federal tax identification number is (1907). The location of the Debtor's corporate headquarters is 13366 Grass Valley Avenue, Suite A, Grass Valley, CA 95945.

[2] Richard Edick is a restructuring professional and principal at The CEO Advantage Group, LLC.

upon my experience, knowledge, and information concerning the operations and financial affairs of the Debtor. If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration.

3.     I have personal knowledge of substantially all of the books, records and files of the Debtor. It is my understanding that the books, records and files of the Debtor are maintained in the normal course of the Debtor's business, with all of the entries made by the Debtor's employees at or about the time the events that were recorded therein occurred.

4.     This Declaration is divided into two sections. Section I provides a brief description of the Debtor's operations, current financial condition, and the events giving rise to this Case. Section II sets forth those facts that are most germane to this Court's determination of the Debtor's various motions for first day relief and is intended to supplement any other declarations or affidavits submitted in direct support of such First Day Motions.

## SECTION I - BACKGROUND

### *Business and Operations*

5.     Eigen, a Delaware corporation, develops imaging tools and products for healthcare professionals. For more than 30 years, Eigen products have allowed physicians to obtain a high-definition view of moving image studies, and such products are currently used in more than 4,000 hospitals worldwide. Eigen is already an established leader in cardiology and radiology imaging and, through its "ei" technology, the company is in the process of developing a revolutionary way to view and biopsy the prostate by generating three-dimensional images of the prostate from ultrasound.

6.     First founded as Eigen Video in 1975, the company originally developed devices for recording images for the film industry. By late 1975, Eigen entered the medical realm when

it introduced the first flexible disk, slow-motion video system, which gave cardiologists the ability to use "instant replay" when reviewing images of the heart. In 1978, Eigen developed the first guideshot recorder for percutaneous transluminal coronary angioplasty (PTCA), which assisted in the treatment of coronary artery disease. During the 1980's, Eigen developed the first high-resolution freeze-frame for VTRs, and in the 1990's, Eigen brought digital imaging to medicine with the first digital disc recorder, the first dual-path optical disc recorder, and the first dynamic digital image archiver. With the advent of the internet in the new millennium, Eigen developed the first universal DICOM acquisition interface for single and bi-plane labs, as well as one of the first to provide archive storage and retrieval with Eigen-Net, a robust network solution for transferring any images, anywhere, anytime.

7.     Eigen's most valuable asset may be its intellectual property for the developments addressed above, which includes technology that has been approved by the FDA related to the early detection of prostate cancer. Eigen's cutting-edge technology is developed in conjunction with its many partners in the medical field. Over the years, Eigen has established relationships with several collaborative medical partners that help to create unique and innovative approaches in the development of medical imaging devices. Such medical partners include Radboud University Nijmegen Medical Center in The Netherlands, University Hospital – London Health Sciences Center, University of California, Los Angeles – Geffen School of Medicine, and the University of Colorado Health Science Center.

8.     Recently, as a result of the collaboration between the company and its medical partners, Eigen has introduced new technology that is providing breakthroughs in the imaging field. DSA 2000 is a new application for use in digital cardiovascular and interventional imaging systems. It provides real-time imaging and allows for easy capture, review and archiving of

DSA sequences and photos. It allows hospitals and other customers to increase workflow efficiencies, minimize back up in other labs, and contain lab equipment expenses. While Eigen continues to provide high-quality imaging devices to the cardiology and radiology fields, it has developed a new "ei" product line to view and detect prostate problems. The "ei" technology provides real-time image guidance in multi-dimensional space for comprehensive visualization, diagnosis and navigation. These products offer uncompromised digital image display, transfer, and duplication capabilities.

### *Debt Structure of the Debtor*

9.     Prior to the commencement of the Case, Kazi Management VI, LLC (the "**Lender**") made loans, advances and provided other financial accommodations to the Debtor, pursuant to the terms and conditions set forth in, among other documents: (i) the secured Convertible Note dated May 26, 2005; (ii) the Secured Convertible Note dated February 1, 2007; (iii) certain agreements between Lender and Debtor regarding 2/9/07 Security Agreement; and (iv) a Security Agreement dated May 26, 2005, and other related Agreements referred to in the Security Agreement and Secured Convertible Notes (each of the documents between the parties as amended, supplemented or otherwise modified prior to the commencement of this Case, and all collateral and ancillary documents executed in connection therewith, collectively, referred to in this Declaration as the "**Pre-Petition Loan Documents**").

10.     As of the Petition Date, the Debtor is indebted to the Lender under the Pre-Petition Loan Documents in the aggregate amount in excess of $20,000,000, exclusive of interest, attorneys' fees, costs, expenses and other charges owing to Lender under the Pre-Petition Loan Documents, including default fees (collectively, the "**Pre-Petition Indebtedness**").

11.     In addition, Eigen has approximately $1,000,000.00 in unsecured debt, exactly half of which is alleged due and owing to one creditor, GE Capital. Finally, Eigen is subject to numerous pending litigation matters in state court where it is vigorously defending itself.

## *Events Leading to Bankruptcy and Chapter 11 Outlook*

12.     Prior to the Petition Date, after a vigorous marketing process, the Lender attempted to commence an asset sale pursuant to Article 9 of the Uniform Commercial Code. However, certain former employees of the Debtor were able to obtain a temporary restraining order ("**TRO**") that prohibited the sale. The litigation related to the TRO and these former employees continues in California state court.

13.     With limited alternatives available, given the disproportionate amount of secured debt and pending litigation, the Lender was unwilling to further fund the Debtor. Moreover, equity investors were unwilling to fund the Debtor under these circumstances.

14.     After considering its options, Eigen hired Richard Edick of The CEO Advantage Group as Chief Restructuring Officer and restructuring counsel to commence a financial restructuring. Mr. Edick is currently working with the Debtor to determine the best course of action to maximize value for all creditor constituencies, which may include a sale of all, or substantially all, of the Debtor's assets. As part of this process, Mr. Edick was successfully able to negotiate the DIP Facility with the Lender that will fund the Debtor, but only through the seeking of an order for relief under chapter 11 of the Bankruptcy Code. With no other options available to it, the Debtor determined to seek protection under chapter 11 of the Bankruptcy Code and seek approval of the DIP Facility.

15.     Concurrently with the filing of its chapter 11 Case (the "**Case**"), the Debtor filed a number of First Day Motions. The Debtor anticipates that the Court will conduct a hearing soon after the commencement of the Case (the "**First Day Hearing**"), at which time the Court will hear the First Day Motions.

16.     Generally, the First Day Motions have been designed to meet the goals of (a) continuing the Debtor's operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of the Debtor's customers, employees, and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of this Case. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve a successful reorganization or other outcome advantageous to Eigen's creditor constituencies. I also believe that the matters addressed in the First Day Motions are of a genuinely emergent nature, and that the relief requested in the First Day Motions is required to preserve the assets of the Debtor's estate and to maintain the Debtor's ongoing business operations. Moreover, I believe, as further described below, that the failure to immediately address the issues set forth in the First Day Motions will have extremely adverse effects on the Debtor, its estate, and its creditors.

### Procedural Relief Requested

#### *Retention and Compensation of Professionals*

17.     The Debtor will seek to retain POLSINELLI SHUGHART PC ("**Polsinelli**") as its bankruptcy counsel to assist in the administration of this Case. The Debtor seeks to retain

Polsinelli as its counsel because of Polsinelli's extensive general experience and knowledge, and in particular, its recognized expertise in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, its expertise, experience and knowledge practicing before the Bankruptcy Court for the District of Delaware, its proximity to this Court, and its ability to respond quickly to emergency hearings and other emergency matters in this Court. Further, Polsinelli's appearance before this Court for the applications, motions and other matters in this Case will be efficient and cost effective for the Debtor's estate. The Debtor believes that Polsinelli is both well-qualified and uniquely able to represent it in this Case in a most efficient and timely manner. In addition, the Debtor reserves its right to retain other professionals.

18. The Debtor also seeks to establish procedures for the compensation of all chapter 11 professionals, including Polsinelli. As a part of its First Day Motions, the Debtor filed a motion to establish monthly compensation procedures for the professionals retained by the Debtor in the Case. The Debtor believes that the procedures suggested in the appropriate motion, including, but not limited to, the payment of 80% of fees and 100% of expenses of each professional on a monthly basis after no objections are received to that professional's fee application, will enable the Debtor to closely monitor the costs of administration, maintain a level cash flow, and implement efficient cash management procedures. Moreover, the procedures will also allow the Court and the key parties-in-interest to ensure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures. It is my understanding that such procedures and customary and routine before this Court.

*Motion of Debtor to Extend Time To File Schedules and Statements*

19. The Debtor has over 100 creditors and parties-in-interest. Given the resultant size and complexity of its business, the urgent manner of the chapter 11 filing and the fact that certain prepetition invoices have not yet been received or entered into the Debtor's financial systems, the Debtor has not had the opportunity to gather the necessary information to prepare and file its Schedules of Liabilities and Statements of Financial Affairs (the "**Schedules and Statements**").

20. The Debtor will, however, immediately commence the extensive process of gathering the necessary information to prepare the Schedules and Statements. For example, attached to the Debtor's chapter 11 petition is a list of the top 20 creditors of the Debtor, including each creditors' name and address.

21. At this time, the Debtor estimates that an extension of at least 15 additional days (for a total of 45 days) until **May 14, 2010**, might provide sufficient time to prepare and file the Schedules and Statements, without prejudice to the Debtor's right to seek further extensions. Further, granting the Debtor additional time to bring its books and records up-to-date and collect the data needed to prepare and file the Schedules and Statements will greatly enhance its accuracy and the Court's ability to efficiently administer this estate.

## Specific Relief Requested

22. In addition to the preceding procedural motions and applications, the Debtor filed contemporaneously herewith several other specific motions and requests for relief.

*Motion of Debtor for Entry of an Order (i) Authorizing Maintenance of Existing Bank Accounts; (ii) Authorizing Use of Existing Business Forms; and (iii) Authorizing Use of Cash Management System*

23. The Debtor understands that among the requirements promulgated by the United States Trustee is for the Debtor to open a new set of debtor in possession books and records on

the Petition Date. The Debtor respectfully submits that opening a new set of books and records would create unnecessary administrative burdens, causing unnecessary expense and utilization of resources.

24. In addition, the Debtor, in the ordinary course of its businesses, uses many checks, invoices, stationery and other business forms. In order to continue its operations in an orderly fashion, the Debtor will require the use of its existing business forms without alteration or change. A substantial amount of time and expense would be required in order to print new checks and other business forms. Although possible to change these forms, the Debtor submits that this would create confusion and delay among its employees and third-parties, most of whom will undoubtedly already be aware of the Debtor's status as a debtor in possession. For these reasons, the Debtor requests that it be authorized to use existing checks and business forms without being required to place the label "Debtor In Possession" on each.

25. The Debtor maintains only one operating bank account (the "**Bank Account**"). As a result, the Debtor believes that it would be cost-effective and least disruptive to the Debtor's reorganization efforts to maintain this Bank Account on a post-petition basis. The Debtor believes that the Bank Account is in a financially stable banking institution, Citizens Bank of Northern California ("**CBNC**"). In addition, the Debtor believes that the Bank Account is in a banking institution with FDIC insurance (up to the applicable limit).

26. The Debtor represents that if the relief requested in this Motion is granted, it will not pay, and CBNC will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

27. The Debtor requests that CBNC be authorized and directed to continue to administer the Bank Account as such account was maintained prepetition, without interruption

and in the ordinary course, and to pay any and all checks, drafts, wires, or electronic funds transfers presented, issued, or drawn on the Bank Account on account of a claim arising on or after the Petition Date so long as sufficient funds are in the Bank Account.

28.     The Debtor further requests that CBNC be restrained from honoring any check, draft, wire, or electronic funds transfer presented, issued, or drawn on the Bank Account and on account of a prepetition claim unless (i) authorized by an order of this Court, (ii) not otherwise prohibited by a "stop payment" request received by CBNC from the Debtor, and (iii) supported by sufficient funds in the account.

29.     To effectuate the foregoing, the Debtor requests that CBNC be authorized and directed to rely on all representations from the Debtor as to which checks should be honored or dishonored. To the extent that the Debtor has directed that any prepetition checks be dishonored, it reserves the right to issue replacement checks to pay the amounts related to such dishonored checks consistent with the orders of this Court.

30.     The operation of the Debtor's business requires that the cash management system continue during the pendency of this Case. Requiring the Debtor to adopt a new, segmented cash management system at this early and critical stage of this Case would be expensive, would create unnecessary administrative problems, and would likely be much more disruptive than productive. Any such disruption could have an adverse impact upon the Debtor's ability to reorganize.

31.     In sum, subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtor requests that the Bank Account be deemed to be a debtor in possession account and that its maintenance and continued use, in the same

manner and with the same account number, styles, and document forms as those employed during the prepetition period, be authorized.

## *Motion of Debtor for Entry of an Order (i) Authorizing Payment of Wages, Compensation and Employee Benefits and (ii) Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations*

32.     In the ordinary course of its business, the Debtor incurs payroll and various other obligations and provides other benefits to its employees for the performance of services. As of the Petition Date, the Debtor employed approximately 32 individuals, of which 31 are full-time employees and 1 is a part-time employee (collectively, the "**Employees**").

33.     The Debtor has costs and obligations with respect to the Employees relating to the period prior to the Petition Date. Certain of these costs and obligations are outstanding and due and payable, while others will become due and payable in the ordinary course of the Debtor's business after the Petition Date.

### *Wage Obligations*

34.     Prior to the Petition Date and in the ordinary course of its business, the Debtor typically paid obligations relating to wages, salary and compensation for the Employees (the "**Wage Obligations**") on a bi-weekly basis through direct deposits into Employees' accounts or by check. The Debtor's current estimated gross payroll (including tax and other withholding) for the Employees, conducted bi-weekly for most Employees and for others, is approximately $96,328.30.

35.     Following the Debtor's customary payroll schedule, the next payroll is due to be paid on April 2, 2010 for Employees. Funds for the Wage Obligations due to be remitted to Employees on this date have already been submitted prepetition (on or about March 30, 2010) to the Debtor's payroll processor, QuickBooks Assisted Payroll. Therefore, the Debtor believes

that these Wage Obligations have effectively already been paid prepetition and that no prepetition amounts are due for Wage Obligations.

36. Nevertheless, in an abundance of caution, and to the extent that the Wage Obligations due to be remitted on the Debtor's next payroll date of April 2, 2010 could be considered prepetition amounts owing to Employees, the Debtor seeks a provision in the Order authorizing the Debtor to consummate these payments.

### *Commission Obligations*

37. The Debtor's revenue comes primarily from developing and selling imaging technology. To maximize the sale of the technological products, the Debtor employs sales employees ("**Sales Employees**") who develop and cultivate relationships with hospitals, health care providers and university research centers. As is typical for employees in sales, including, those in the healthcare sales industry, a portion of the Sales Employees' compensation is tied to the sales they generate. Accordingly, the Sales Employees are entitled to receive commissions ("**Commission Obligations**," and together with the Wage Obligations, the "**Wage and Commission Obligations**") under various sales commission programs (collectively, the "**Commission Programs**"). Some of the Sales Employees receive commissions in addition to a salary. The Commission Obligations include cash compensation for commissions earned in the previous payroll cycle and are paid to the relevant Sales Employees at the same time as payroll is paid.

38. On a prepetition basis, the Debtor estimates that Sales Employees had earned approximately $925.11 in Commission Obligations (through the Petition Date) in the aggregate that has not yet been paid. Those Commission Obligations are due to be paid during the April 2,

2010 payroll. The Debtor seeks to pay the Commission Obligations earned prepetition in the ordinary course of business post-petition as they become due.

39.     The Sales Employees are responsible for generating a significant amount of the Debtor's revenue and have historically been paid compensation under the Commission Programs in the ordinary course of business. Thus, the Debtor also seeks to be authorized, but not directed, to continue the Commission Programs in the ordinary course of business on a post-petition basis. Any failure to pay the Commission Obligations would significantly jeopardize the Debtor's ability to sell its products and thus generate revenue.

*Payroll Taxes*

40.     The Debtor is required by law to withhold from the Wage and Commission Obligations amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "**Withholding Taxes**") and to remit the same to the appropriate taxing authorities (collectively, the "**Taxing Authorities**"). In addition, the Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "**Employer Payroll Taxes**" and, together with the Withholding Taxes, the "**Payroll Taxes**").

41.     On a bi-weekly basis for most employees, and on a semi-monthly basis for others, the Debtor remits to the Taxing Authorities approximately $10,134.13 in Payroll Taxes.

42.     Amounts for Payroll Taxes for the April 2, 2010 payroll have already been submitted by the Debtor on or about March 30, 2010, along with amounts for Wage Obligations

as discussed above. Therefore, the Debtor believes that these Payroll Taxes have effectively already been paid prepetition and that no prepetition amounts are due for Payroll Taxes.

43. Nevertheless, in an abundance of caution, and to the extent that the Payroll Taxes due to be paid on the Debtor's next payroll date of April 2, 2010 could be considered prepetition amounts owing to the Taxing Authorities, the Debtor seeks an Order authorizing the Debtor to consummate the payments of Payroll Taxes submitted along with the April 2, 2010 payroll payments that were funded on or about March 30, 2010.

*Payroll Tax Processing Service Obligations*

44. The Debtor employs QuickBooks Assisted Payroll to provide payroll tax services to the Debtor. As consideration for providing these payroll tax services to the Debtor, QuickBooks Assisted Payroll is paid a monthly fee by check or wire transfer. The Debtor pays an average of $250.00 per month to QuickBooks in administrative fees for these services (the "**QuickBooks Payroll Service Fees**"). Payment of these fees is crucial for the Debtor's seamless entry into chapter 11. As of the Petition Date, the Debtor believes that it does not owe QuickBooks any sums in outstanding prepetition amounts for processing payroll.

*Reimbursable Expenses*

45. The Employees incur various expenses (the "**Reimbursable Expenses**") in the discharge of their ordinary duties. Specifically, the Debtor advances or reimburses funds to Employees for a variety of business-related expenses, including without limitation, mileage, car/taxi rental, airfare, parking, meals and lodging. Expenses are advanced or reimbursed on a rolling basis. Because these expenses are incurred as part of their official duties and in furtherance of the Debtor's business, the Employees are advanced or reimbursed in full after submission of appropriate documentation to the Debtor's accounting department.

46.     Because certain Employees incur these expenses as part of their official duties and in furtherance of the Debtor's business, the Debtor determines the legitimate and reasonable expenses necessary for the Employees to discharge their duties and such amounts are paid in advance directly to the Employees. Additionally, other Employees are reimbursed in full after submission of appropriate documentation to the Debtor's accounting department.

47.     Although it is difficult for the Debtor to determine the amount of Reimbursable Expenses outstanding at any particular time, the Debtor estimates that approximately $35,000.00 in Reimbursable Expenses remains outstanding as of the Petition Date.

48.     The Reimbursable Expenses were all incurred as business expenses on the Debtor's behalf and with the understanding that they would be reimbursed. Accordingly, to avoid financial harm to Employees who incurred Reimbursable Expenses, the Debtor requests authority, to be exercised in its sole discretion, to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices and (b) pay all Reimbursable Expenses due and owing (including those that accrued prepetition), or that may become due and owing, to Employees.

### *Employee Benefit Plans*

49.     In the ordinary course of business, the Debtor has established various benefit plans and policies for its Employees, which can be divided into the following categories (collectively, the "**Employee Benefits**"): (1) medical, dental, life and disability insurance (collectively, the "**Health and Welfare Plans**"); and (2) 401(k) plan (the "**401(k) Plan**"). The Debtor deducts specified amounts from the Employees' wages in connection with certain of the Employee Benefits, such as medical insurance and 401(k) Plan contributions.

50.     Maintaining the Employee Benefits is critical to Employee morale and protecting the integrity of the Debtor's business and the value of its estate.

*(a)*     ***Health and Welfare Plans***

51.     The Debtor sponsors several Health and Welfare Plans to provide benefits to Employees, including, without limitation, medical, dental, vision, life and disability insurance (the "**Basic Healthcare Package**").

52.     The Debtor offers a Basic Healthcare Package to all of its full-time Employees. The Basic Healthcare Package is administered by Blue Shield of California, Unum Life Insurance and Ameritas.

53.     Within the Basic Healthcare Package, the Debtor's medical coverage is provided through fully insured medical plans (the "**Medical Plans**"). The Debtor pays $4,494.00 on a monthly basis for coverage under the Medical Plans. As of the Petition Date, the Debtor estimates that it owes Blue Shield of California approximately $4,494.00 in accrued and unpaid prepetition amounts on account of the Medical Plans for April, 2010. Payments for April, 2010 and subsequent months will become due each month after the Petition Date.

54.     Ameritas administers the Debtor's fully insured dental plans ("**Dental Plans**") for most of the Debtor's Employees. The Debtor pays $917.28 on a monthly basis for coverage under the Dental Plans. As of the Petition Date, the Debtor does not owe Ameritas any accrued or unpaid prepetition amounts on account of the Dental Plans for March, 2010; however, payments for April, 2010 and subsequent months will become due each month after the Petition Date.

55.     The Debtor maintains basic life insurance for certain of its full-time Employees in addition to accidental death and dismemberment coverage ("**Life Insurance Plans**"). The Life

Insurance Plans are administered by Unum Life Insurance. The Debtor pays $111.24 on a monthly basis for coverage under the Life Insurance Plans. As of the Petition Date, the Debtor does not owe Unum any accrued or unpaid prepetition amounts on account of the Life Insurance Plans for March, 2010; however, payments for April, 2010 and subsequent months will become due each month after the Petition Date.

### (b) Paid Time Off Benefits

56. Under the Paid Time Off ("**PTO**") Plans, full-time Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation/well time. The Debtor's Employees earn their annual vacation days based on 4.62 hours per pay period for less than five years of service and 6.15 hours per pay period for more than 5 years of service. Employees are entitled to receive from 10 days to 15 days of paid vacation annually, depending on years of service. Generally, under the Debtor's vacation policy, vacation time is accrued per pay period. As of April, 2010, the Debtor estimates that the cash value of the Debtor's Employees' accrued vacation time was approximately $79,665.97. Generally, this amount is not a current cash payment obligation as Employees are only entitled to be paid for accrued and unused vacation time in the event that the Employees were to leave the employment of the Debtor, or if required by applicable state law at the end of the year. As such, most Employees will receive their vacation time as paid time off in the ordinary course of business (and not as a cash payment).

57. The Debtor also administers other paid time off programs for holidays, short-term disability, military duty, jury duty, and bereavement. Unlike vacation time, these other types of leave are not paid upon termination and are only applicable if the leave time is actually used by the Employee.

*(c) 401(k) Plan*

58. The Debtor sponsors a retirement investment plan and withholds from the wages of participating Employees contributions towards the 401(k) Plan. The Standard (the "**401(k) Manager**") administers the 401(k) Plan. The 401(k) Manager does not charge the Debtor any fees for administering the program.

59. The Debtor estimates that approximately $85,000.00 in 401(k) Plan contributions remains outstanding as of the Petition Date.

*Workers' Compensation Program*

60. Under the laws of the various states in which it operates, the Debtor is required to maintain for its employees workers' compensation coverage for claims arising from or related to their employment with the Debtor (the "**Workers' Compensation Program**"). The Debtor currently maintains its Workers' Compensation Program with The Hartford Insurance Company (the "**Workers' Compensation Insurer**") as insurer.

61. Pursuant to the Workers' Compensation Program, the Debtor pays to the Workers' Compensation Insurer premiums that are calculated based upon the Debtor's payroll and historic loss rates (the "**Workers' Compensation Premiums**"). For the coverage provided by the Workers' Compensation Insurer, the premiums are paid in monthly installments. The Debtor projects that, as of the Petition Date, the Debtor has accrued approximately $8,000.00 in prepetition amounts due for Workers' Compensation Premiums.

62. Under the Debtor's Workers' Compensation Program, as far as the Debtor is aware, there were no open workers' compensation claims ("**Workers' Compensation Claims**") as of the Petition Date.

*Motion of Debtor for Entry of an Order (i) Approving Debtor's Adequate Assurance of Payment to Utilities, (ii) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment, and (iii) Scheduling a Hearing with Respect to Contested Adequate Assurance of Payment Requests*

63. In connection with the operation of its business and the management of its property, the Debtor receives utility service from various utility companies and other providers (the "**Utility Companies**"), including providers of electricity, natural gas, water, telephone, internet and cable service, and waste management services (collectively, the "**Utility Services**"), covering a number of utility accounts. The Debtor's aggregate average monthly cost for Utility Services is approximately $5,700.04.

64. As of the Petition Date and as qualified below, the Debtor is generally current on payments to the Utility Companies for the Utility Services. Overall, the Debtor has an established payment history with most of the Utility Companies indicating consistent payment for services. As of the Petition Date, however, the Debtor may have had (a) prepetition accounts payable to certain Utility Companies, (b) outstanding checks issued to certain Utility Companies in payment for prepetition charges for utility services that had not cleared the Debtor's bank account prior to the Petition Date, or (c) liabilities for prepetition Utility Services for which the Debtor had not yet been billed.

65. Access to the Utility Services is critical to the Debtor's ongoing operations. Should any Utility Company refuse or discontinue a utility service even for a brief period of time, the Debtor's operations and administrative functions would be severely disrupted. Any such disruption would diminish the value of the Debtor's estate. In this regard, it is in the best interest of the Debtor, its estate and its creditors to maintain continuous and uninterrupted Utility Services during the Case.

66. The Debtor seeks the relief requested in this Motion in order to preserve the protections that Utility Companies have under the Bankruptcy Code, while affording the Debtor an opportunity to provide and negotiate adequate protection without facing the threat of imminent termination of Utility Services. In particular, the Debtor requests approval of certain procedures that balance the protections afforded the Utility Companies under Bankruptcy Code section 366 of the Bankruptcy Code and the Debtor's need for continuous and uninterrupted Utility Services.

67. The Debtor fully intends to pay all post-petition obligations owed to the Utility Companies in a timely manner. Moreover, the Debtor expects that borrowings under its proposed post-petition credit facility will be sufficient to pay such post-petition utility obligations.

68. Additionally, even though the Debtor maintains that the borrowings available under its proposed post-petition credit facility are sufficient adequate assurance of payment, the Debtor proposes, as "adequate assurance of payment" for the Utility Companies, establishing the Utility Deposit Account, in accordance with the terms and conditions of the Debtor's proposed post-petition credit facility, in the amount of $2,850.02 which amount is equal to the charges incurred by the Debtor for approximately 2 weeks of Utility Service from all of the Utility Companies.

69. Specifically, the Debtor proposes to establish the Utility Deposit Account by establishing a segregated deposit account funded in the amount of $2,850.02 to be administered in accordance with the Order. The Utility Deposit Account will serve as a cash security deposit to provide adequate assurance of payment for post-petition Utility Services.

70.     The Debtor submits that the Utility Deposit Account, in conjunction with the Debtor's ability to pay timely for future utility services in the ordinary course of business (collectively, the "**Proposed Adequate Assurance**"), constitutes sufficient adequate assurance of payment to the Utility Companies. Nonetheless, the Debtor anticipates that certain Utility Companies may not find the Proposed Adequate Assurance "satisfactory" and, thus, may request additional adequate assurance of payment pursuant to section 366(c)(2) of the Bankruptcy Code. Accordingly, the Debtor proposes that such requests be addressed through a set of streamlined procedures (the "**Additional Adequate Assurance Procedures**").

71.     The Debtor maintains that the relief requested herein strikes a fair balance between the rights of Utility Companies and the rights of the Debtor under the Bankruptcy Code and the need, for the benefit of the Debtor and its estate, for the Debtor to continue to receive the Utility Services upon which its business depends. The Debtor believes that the establishment of the Utility Deposit Account, the uninterrupted continuation of the Utility Services, and the approval of the Additional Adequate Assurance Procedures will not prejudice the Utility Companies.

72.     By establishing the Additional Adequate Assurance Procedures, the Debtor seeks to implement an orderly process to determine the amount of assurance of payment that is adequate. Without the Additional Adequate Assurance Procedures, the Debtor could be forced to address numerous requests by Utility Companies in an unorganized manner at a critical period in its efforts to reorganize. The orderly process contemplated by the Additional Adequate Assurance Procedures, therefore, is necessary for a smooth transition by the Debtor into chapter 11. Moreover, the Debtor believes that the Additional Adequate Assurance Procedures will ensure that all parties act in good faith by establishing a fair process. This will protect the

Debtor and its stakeholders from an attempt by a Utility Company to delay a request until the last minute in an effort to force the Debtor to agree to its request or face cessation of essential services.

## *Motion of Debtor for Entry of an Order Authorizing Retention and Payment of Professionals Utilized by Debtor in the Ordinary Course of Business*

73. The Debtor employs certain professionals, including attorneys, accountants and other professionals (collectively, the "**Other Professionals**"). The Other Professionals provide services to the Debtor in a variety of matters unrelated to this chapter 11 Case, including specialized legal services, accounting services, auditing and tax services and certain consulting services.

74. These Other Professionals have a great deal of background knowledge, expertise and familiarity with the Debtor and its operations. Although the Debtor anticipates that the Other Professionals will want to continue to represent the Debtor on an ongoing basis, some may not do so if the Debtor cannot pay them on a regular basis. I believe that the continued employment and compensation of the Other Professionals is in the best interests of the estate, creditors and other parties in interest.

## *Motion of Debtor for Entry of an Interim Order (i) To Obtain Post-Petition Financing Pursuant to Section 364 of the Bankruptcy Code, (ii) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (iii) Granting Liens and Superpriority Claims, (iv) Granting Adequate Protection to the Prepetition Secured Parties, and (v) Scheduling a Final Hearing on the Debtor's Motion to Incur Such Financing on a Permanent Basis*

75. As set forth in more detail above, prior to the commencement of the Case, the Lender made loans, advances and provided other financial accommodations to the Debtor, pursuant to the terms and conditions set forth in, among other documents: (i) the secured Convertible Note dated May 26, 2005; (ii) the Secured Convertible Note dated February 1, 2007;

(iii) certain agreements between Lender and Debtor regarding 2/9/07 Security Agreement; and (iv) a Security Agreement dated May 26, 2005, and other related Agreements referred to in the Security Agreement and Secured Convertible Notes (previously defined as the "**Pre-Petition Loan Documents**").

76. Pursuant to the Pre-Petition Loan Documents, the Lender agreed to provide a revolving line of credit (the "**Revolving Loan**") of $3,300,000.00, of which $2,000,000.00 of new money will be available on an interim basis.

77. The Debtor has an immediate need for post-petition financing in order to continue the operation of its business for the duration of this Case, all in a continuing effort to preserve and maximize the value of its assets for the benefit of creditors, and to consummate a plan of reorganization that will maximize returns for all such creditors.

78. Due to the fact that virtually all of the Debtor's cash constitutes "cash collateral," and all or substantially all of their non-cash assets are subject to the prepetition liens and security interests of the Lender, the Debtor is currently without sufficient unencumbered funds with which to pay ongoing wages, salaries and day-to-day operating expenses, all of which are vitally necessary to continue the operation of the Debtor's business in the short term, and otherwise administer the chapter 11 Case to conclusion. Due to the nature and magnitude of the business, which are dependent upon uninterrupted access to the funds necessary to operate, the Debtor's immediate access to the proposed debtor-in-possession financing is absolutely necessary in order to maintain ongoing operations, maximize the value of its available assets in the near term, and to avoid immediate and irreparable harm to its estate and creditors.

79. As a result of extensive arm's length negotiations conducted by the Debtor and the Lender, those parties have agreed and consented to permit the use of Cash Collateral and/or

provide the Debtor with additional loans and financial accommodations during the post-petition period pursuant to (i) the terms of the DIP Facility, (ii) the terms of the proposed form of Order, and (iii) the Budget, pending the opportunity to conduct a final hearing on the DIP financing.

80.     The net practical effect of these financial accommodations should enable the Debtor to commence, and continue to administer, in an orderly fashion, this chapter 11 Case with the financial resources necessary to maintain operations and to maximize returns to all interested constituencies.

81.     Leading up to this Case, the Debtor explored strategic alternatives and engaged in negotiations with certain parties in an effort to obtain additional liquidity. However, given the current economic climate, the Debtor was unable to obtain alternative financing. The DIP Facility, which was the product of good faith negotiations, is well within the Debtor's sound business judgment as it addresses the Debtor's reasonably foreseeable liquidity needs, while maintaining the going concern value of the Debtor's business.

### Conclusion

For the foregoing reasons, the Debtor believes that granting the relief described herein is appropriate and in the best interest of the Debtor's estate, creditors and all parties-in-interest.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 30 day of March, 2010, in the State of CALIFORNIA.

By: _____
Name:  Richard Edick
Title:   Chief Restructuring Officer of Eigen, Inc.